506

DORIS McCASTLAIN, COMM'R OF REVENUES* *v.*
OKLAHOMA GAS & ELECTRIC CO. ET AL

5-4292                                          420 S. W. 2d 893

4      Opinion delivered November 20, 1967

*This action was commenced against Doris McCastlain, as Commissioner of Revenues, the judgment was rendered against her as such, and the appeal was taken by her. The briefs were filed in the name of B. Bryan Larey, as Commissioner of Revenues, but no substitution of parties has ever been made. Since the litigation was against the former Commissioner in her official capacity, any judgment or decree would be binding on her successors in office.

*Lyle Williams, Tom Tanner* and *Hugh Brown,* for appellant.

*Bryan & Fitzhugh; House, Holmes & Jewell; Arnold & Arnold,* and *H. Duane Stratton,* Oklahoma City, Okla., for appellees.

JOHN A. FOGLEMAN, Justice. Appellant made an adjusted assessment against appellee Oklahoma Gas & Electric Company under the Arkansas Compensating Tax Act on the use of certain items claimed to be exempt by the electric company. After paying the tax under protest and exhausting administrative remedies, the company brought suit against appellant seeking to recover the tax with interest. Southwestern Power Company was permitted to intervene, but has actually only asked that Oklahoma Gas & Electric Company have the relief it seeks. Since Southwestern has actually filled the role of amicus curiae, we will refer to Oklahoma Gas & Electric Company as the appellee.

The adjusted tax and penalty in the sum of $21,-743.29 were assessed upon some 365 items. Protest was made on items on which the assessment amounted to $21,126.27. These items fall roughly into three categories:

1. Steel towers, wooden poles, crossarms, supports, insulators and other items supporting the wires over which electric current is transmitted and distributed.

2. Items constituting substations.

3. Items used for street and area lighting purposes.

Exemption of these items is claimed under § 6 of Act 487 of 1949 [Ark. Stat. Ann. § 84-3106 (G) (Supp. 1965),] the pertinent provision of which is as follows:

"Public Electric Power Companies. Tangible personal property, consisting of electric power generating machinery, transformers, control boards, substation equipment, lines, meters, and all other accessory equipment and devices used directly in and connected to and becoming a part of the primary electric power generating and distribution system is declared to be a public transmission facility and exempt from the tax imposed herein. Buildings, dams, shops, tools, maintenance equipment, office machines and supplies, automotive equipment, and all other materials of whatever kind or character incidental to such primary generating transmission facility are not included or classified as exempt."

The trial court granted judgment in favor of appellee on all items involved in the protest. From that judgment appellant brings this appeal, citing the following points for reversal:

I. Exemptions from taxation are never presumed, and to doubt is to deny an exemption.

II. Ark. Stats., § 84-3106 (G), paragraph 3 exempts from the Arkansas Compensatng (Use) Tax a certain class of tangible personal property which is both specific and limited in its composition.

III. The Legislature further limited this exemption by providing four rules or guide lines by which the particular item seeking exemptions must abide before the exemption may be granted.

We find it unnecessary to deal with the first point as we feel that the statute may be applied to the various items in question without reasonable doubt, making resort to presumptions inappropriate. As to the other points, we will deal with them as related to the various items rather than discuss the points separately.

It is the contention of appellant that the word "lines" as used in the exemption statute should be construed to mean "wires" only and that none of the materials utilized for the support of these wires is exempt. On the other hand, appellee contends that this exemption is broad enough to cover transformers, substations, street lighting equipment, and virtually all of the questioned items. Appellant's position is that the popular definition of the word should control, while appellee contends that the technical definition followed in the industry should govern. Appellee bases its contention upon the rule that commercial, trade or professional terms used in a statute dealing with the trade, business or profession are construed in the sense in which such terms are generally understood in that trade, business or profession, even though such meaning may differ from the common, ordinary meaning. As to the items involved, we would come to the same conclusion without regard to the definition used. We base our findings on what appears to us to be the clear legislative intent.

The word "electric" preceding the specification of items of tangible personal property in the first sentence of the applicable subsection quite obviously modifies each of the items specified; *i. e.,* the tangible personal property includes *electric* transformers, *electric* substation equipment, *electric* lines and *electric* meters. In view of the commonly accepted concept of the meaning of the term "electric lines," we do not see how the ex-

tremely narrow definition urged by appellant could have been intended by our General Assembly. Individuals in ordinary conversation refer to electric lines as the entire structure carrying electric current from the point of generation to the place of consumption. We speak of electric lines in the same sense as we do of railroad lines and telephone lines. On those subjects we do not think of railroad lines as consisting of the steel rails only, nor do we mean that telephone lines are composed of the wires only. Definitions of the word "lines" in our dictionaries reflect this usage. Among those given by Funk & Wagnalls New Standard Dictionary are: "The *roadbed* of a railroad" [Emphasis added]; . . . "The system of wires and poles comprising a telegraph or telephone connection between two points, as the Western Union *lines* were all down."

Webster's New International Dictionary, Third Edition, includes: "The principal circuits of an electric power system" . . . "The track or roadbed of a railway."

The General Assembly resorted to this usage in granting to electric power companies the right of eminent domain and the right to use public highways and streets when ; authorized the construction, operation and maintenance of "lines of wire, cables, poles, etc., necessary for the transmission of electricity." Ark. Stat. Ann. § 35-301 (Repl. 1962). Rural electric cooperatives are given similar rights for their "lines." § 77-1104 (11) (Repl. 1957).

The legislative intent is further indicated by reason of the fact that the General Assembly specifically mentioned items such as transformers, control boards, and meters. All of these terms identify the articles intended with certainty. It seems only logical that if the General Assembly had intended to exempt only wires, it would have used that word. Furthermore, no logical reason has been offered to explain why it would exempt all generating machinery, transformers, control boards, substation equipment, wires, meters, all other accessory

equipment and devices used directly in and connected to and becoming a part of the primary electric power generating and distribution system and not exempt the steel towers, wooden poles, crossarms, insulators, guying equipment and other items supporting the wires and making it possible for electric current to be transmitted over them. We agree with the chancellor that these items are exempt. We also agree that such items as signs and numerals required to be mounted on the structures are exempt.

Appellant also questions the exemption of the substations and the fences around them. While we do not agree that these are parts of the "lines" exempt, we must consider whether these items constitute "substation equipment" or "other accessory equipment and devices used directly in and connected to and becoming a part of the primary electric power . . distribution system." In doing so, we must keep in mind that buildings, shops, and other materials incidental to such primary generating transmission facility are not exempt.

According to the undisputed evidence, substations serve the purpose of transforming the electricity from the high voltage used for transmission to a voltage suitable for distribution to customers for use.[1] Substations consist of transformers, switches, control systems and other appurtenances necessary to transform electricity from one voltage to another. The *structural* steel which supports substation equipment apparatus (such as capacitors, fuses, switches, busses, insulators, regulator, wave trap, line terminals, current and potential transformers) is one of the principal substation items on which the assessment is questioned. The undisputed testimony is that it is necessary that this equipment be structurally supported and elevated above the ground. It was also shown that the protested *reinforcing* steel

---

[1] While this is the principal use of the stations involved in this litigation, they are also used in certain instances to increase voltages for transmission.

was an essential component of necessary concrete foundations and pads which supported apparatus constituting substation equipment which includes units such as circuit breakers and lightning arresters as well as the above enumerated items. This steel is also tied to the ground mat—a series of criss-crossed conductors under the earth. It seems to us that all this steel is as essential to a substation as is the apparatus it supports and is exempt as substation equipment.

Appellant also urges that the trial court improperly sustained an exemption of the chain link fencing around the substations. This fencing is required by the Arkansas Public Service Commission through adoption of the National Electric Safety Code. Its purpose is to prevent the general public from coming into the substation, where, due to the presence of extremely high voltage electrical equipment, danger to uninformed persons might be imminent. While safety requirements of the Commission are persuasive, they are not necessarily controlling. The undisputed testimony, however, shows that the fencing complex is bonded into the ground mat through the ground grid connection as a part of the earth feature of the substation. This in itself is sufficient basis for holding this item to be exempt as substation equipment.

By similar reasoning, we find that fluorescent lights are equipment essential to the utilization of control boards and should be considered exempt as a part thereof. The same may be said of conduit for control cables connecting other substation equipment to control boards. An electric heater is substation equipment because it is necessary to control the temperature in which the sensitive devices constituting the control board must operate.

Appellant contends that components of an enclosure for control boards, meters and other substation control equipment should be classified as a building and, thus, subject to the tax. These units are roof ventila-

tors, wall louvers, steel doors and joists, door frames and roof decking. We hold these to be substation equipment. The undisputed testimony is that these components constitute what is known as a control house, the function of which is to protect the very sophisticated and sensitive control board and equipment from adverse environment by providing an enclosure which can be ventilated, heated or air conditioned as the occasion demands.

A line tuner is a control device which automatically disconnects the lines in the event of inadvertant contact with the lines or an uncontrolled flow of electricity and which later automatically reconnects the circuit. When used in a substation, it is substation equipment.

We cannot agree, however, that lighting equipment is exempt. These light fixtures and components are for the consumption, not the transmission or distribution of electric power. Appellee makes the ingenious argument that these items should be exempt because we have held that street lighting fixtures constitute an integral part of a municipal electric system. In *Todd* v. *McCloy*, 196 Ark. 832, 197 S. W. 2d 160, it was said that the provision of ornamental standards and electric lighting equipment to provide modern "white way" electric illumination for city streets was such an enlargement, extension and improvement of a municipally owned light plant and distributing system as to constitute a proper project for financing by issuance of bonds by the city under Amendment Thirteen to our Constitution. Appellee is not operating a municipally owned system which traditionally furnishes street lighting in cities without charge. It is making a charge to cities and private consumers for the service on the basis of a monthly tariff. As a matter of history, the very origin of municipal power systems was in the authority granted to cities to construct or acquire works for lighting the streets. See § 14, Act No. 1 of March 9, 1875. The authority to furnish the power to consumers was added later. See § 1,

Act No. 230 of May 6, 1909. The luminaries, hoods, reflectors and mounting and supporting brackets used for street lighting purposes do not constitute equipment and devices used directly in and becoming a part of the primary electric power and distribution system.

Neither can we agree that pole bandages come within any of the property exemptions under the statute. These bandages are impregnated with chemicals used to protect wooden poles from fungi. They are placed around the ground line of reset poles to restore wood preservatives that have leached out while the pole was formerly set in the ground. If these can be said to be a part of the lines, so could a chemical wood preservative bought for treating poles or chemicals acquired to keep pole attacking insects from the power line right-of-way.

Appellant makes the argument that exemption of these items gives out-of-state vendors an advantage over in-state businesses dealing in these products. We need not go into the purposes or objectives of the legislative department in granting these exemptions. The wisdom of legislation is not for our determination or consideration, but is for the General Assembly.

Appellee has asked that we assess costs for its supplemental abstract upon the contention that appellant's abstract was not in compliance with Rule 9. Appellant's abstract failed to contain reproductions of exhibits introduced, many of which were necessary for a clear understanding of the testimony, since practically all of the principal witness's testimony was directed toward the introduction and explanation of the exhibits. Furthermore, appellant gave references to the record page numbers only at the introduction of the testimony of each witness, then he showed only the respective beginning and ending pages of the record of their testimony. A considerable part of appellee's supplemental abstract was essential to an understanding of all the questions presented to this court. An award of costs might be ap-

propriate if it were not for the fact that the State of Arkansas is the real party in interest. It is a generally recognized principle that a state has no liability for costs unless there is specific statutory authorization, at least where the state is acting in a governmental capacity and did not institute the action. The immunity, an attribute of sovereignty, extends to the officers, boards and agencies of the state. See, Annot., 72 ALR 2d 1379; 20 Am. Jur. 2d 27, Costs, § 32; 81 C.J.S. 1345, States, § 234. We find no authorizing statute. No mention of costs is made in the statute [Ark. Stat. Ann. § 84-3120 (Repl. 1960)] authorizing this action. The policy of Arkansas in this regard may be found in statutes which exempt the Commissioner of Revenues from payment of costs for institution or prosecution of any suit (§ 84-1719) and which exempt the State from giving security for costs (§ 27-2307). Thus, we cannot assess costs against appellant in this case.

The chancery court is affirmed as to that part of the judgment rendered for recovery of the tax paid on the items we find to be exempt and reversed on those we find not to be exempt. While we would ordinarily modify the judgment here, neither the adjusted assessment nor any other exhibit showing the detailed calculation of tax and penalty paid under protest is in the record and we are unable to make the necessary calculation, so we remand this case for entry of a proper decree.